## Commonwealth v. Kiefaber

*Paul R. Beckert,* District Attorney and *William Thatcher,* Assistant District Attorney, for Commonwealth.

*Alan D. Williams, Jr.,* for defendant.

BIESTER, P. J., July 28, 1961.—Defendant, William Kiefaber, having been convicted by a jury of the

charges of burglary and conspiracy has moved for a new trial. In order to appreciate the problems involved, it is necessary that we refer in some detail to the nature of the charges against defendant and the evidence produced before the jury to establish his guilt.

At approximately 3 to 3:15 on the early morning of December 17, 1959, Richard Cantillon and Edward Martella broke into the Quaker Lanes Bowling Alley on Route 309, sometimes called the Bethlehem Pike, in Bucks County, making their entry through the roof of that building. Two Pennsylvania State Policemen were concealed in the bowling alley at the time, observed the breaking into the building and apprehended these two subjects while the crime was being committed. The present defendant was charged as a conspirator in connection with the commission of this offense and, by reason of such conspiracy, with the burglary. The sole question before us is whether there was sufficient legal and acceptable evidence to justify the jury's passing upon Kiefaber's guilt. The case against him is one of circumstantial evidence.

Tried jointly with defendant was one Joanne Anderson, a sister of Cantillon, and, according to defendant, defendant's part-time employe and girl friend. The court sustained a demurrer as to the charges against her.

At about 4 o'clock on the morning in question, Pennsylvania State Police Officers, engaged in a general patrolling of the area, observed defendant and Mrs. Anderson, in what we now know was Mrs. Anderson's car, on a road sometimes known as the Old Bethlehem Pike, which runs parallel with Route 309, at a distance of between a mile and a mile and three-quarters from the scene of the crime. The car was being operated in a southerly direction, that is to say in the general

direction of the bowling alley. At about 5 o'clock the same morning, the officers again saw the vehicle on a parking lot near Trainer's Restaurant, which is at the intersection of Route 309 and Route 663, approximately one-half mile to one mile from the scene of the crime. The lights were on the vehicle, and it was moving slowly out of the parking area. One of the officers, recognizing the vehicle as the one he had seen earlier, asked what the parties were doing in that neighborhood at that time, not then knowing that Mrs. Anderson was the sister of Cantillon, who was at that time in custody. He was told by Kiefaber that they had been to the City of Bethlehem to observe the Christmas lights and decorations and that "he had been doing a little cheating." He handed the officer a business card of Will-Joy Decorators. No further inquiry was made, and defendant and Mrs. Anderson were permitted to leave the scene. When Cantillon was questioned, a similar business card was found in his possession and, it having been ascertained that Mrs. Anderson was Cantillon's sister, Mrs. Anderson and defendant were taken into custody and questioned respecting their presence at that hour of the morning near the scene of the crime. It was then found that the Will-Joy Decorating establishment was "very near" the Anderson home and that Cantillon resided with his sister. When defendant was questioned, he said that he had met Mrs. Anderson that evening and had had dinner with her; that they had driven around the City of Philadelphia looking at the Christmas decorations, in which Mrs. Anderson was much interested. He reiterated what he had earlier said that they had gone to the City of Bethlehem to observe the Christmas decorations. Asked whether he knew Cantillon and Martella, he said that he knew Cantillon, but not Martella, although "he did know or have the occasion to meet a man by the name of Jake", which he later stated could

be an alias for Edward Martella. He agreed, however, on cross-examination, that Martella some two months before Christmas had used his (Kiefaber's) address as the place to which certain papers in connection with an automobile transfer might be sent from California, addressed to Martella or to Martella's wife.

After such preliminary questioning, Cantillon was brought into the presence of Kiefaber. Cantillon had made a complete statement as to his part in the crime which implicated defendant. Prior to his confrontation, an exact copy of Cantillon's statement, in triplicate, had been prepared by the police. The original statement was given to Kiefaber and the officer read a typewritten copy. Upon the completion of the reading, Kiefaber said nothing, and the officer made no inquiry, except to ask whether the statement was understandable to Kiefaber and whether he was following the officer. The officer's description of the incident was that after a reading of the statement, "defendant remained mute and he displayed a cold stare in the direction of Cantillon."

The statement, in part, was to the effect that Cantillon and Martella were brought to the scene of the crime by Kiefaber and Mrs. Anderson, and that, after the commission of the offense, they were to be picked up by them ("Our pick-up signal was a handkerchief along the side of the road that we were ready to leave"). The statement further said:

"In all our jobs Bill Kiefaber would mention a job and he would send us out to case the job. He would receive a third cut of the job after we would complete it. He would school us in his own procedure, which was to drop the tools while the place was open and after it was closed he would have us telephone the place to see if anybody was left there to watch the place."

When the case was tried, the typewritten copies of the original statement were lost, or misplaced, and the court permitted the original statement to be read in the presence of the jury, since the typewritten copies were not available. The officers testified that they had made a careful search for the copies but could not find them, the explanation being given that the officers felt that they had served their purpose upon having been read, and that it did not occur to them to carefully retain the typewritten copies.

Following the reading of the statement, Cantillon, Martella and Kiefaber were placed in individual cells, the center one being occupied by Kiefaber, this cell having a microphone which permitted the officers to monitor the conversation amongst the prisoners. Notes were taken of this monitoring by one Joel L. Mosely, a policeman of the Borough of Quakertown, and later by Officer Griffith of the Pennsylvania State Police. The officers did not note all that was said, but did make notes of a number of statements made by Kiefaber, or questions asked by him. Amongst these are the following: "Do you want to go this alone, Dick?" "Are you gonna go with the State or with us?" "Dick you didn't write all that." "Just remember I am back of both of you." "You just wanted to do some bragging; we'll beat that statement." "Your sister and I left the house Wednesday at four o'clock. Had a few drinks. Went to Bethlehem to see the decorations. State Police stopped us at Trainer's." "Did they read the statement to your sister?" "Came up in a truck, that's all you gotta say." "Regardless of what they say that's your story and stick to it. They made you say and write it." "If we get separated, give me your word we'll see what we can do with the jackpot. We'll start all over again. We have to live with each other." During the time the prisoners were in adjacent cells, defendant gave $10 to both Cantillon and Martella.

There was further testimony, by the proprietor of the bowling alley, that he had seen Kiefaber at the bowling alley within a period of several weeks prior to the commission of the crime.

When defendant took the stand, he admitted that the earlier reason assigned by him for being in the neighborhood where the crime was committed was untrue; that he had been there to pick up Cantillon. He denied, however, that he knew Cantillon's purpose in being at the scene. He testified that he and Mrs. Anderson had dinner that evening together and had been at a bar; that he left Mrs. Anderson at her home at about 8 o'clock, returning thereto at about 9 o'clock; that his purpose in returning was to discuss some matter of business with her; that he watched television briefly and then went to sleep. At about 1:30 or 2 o'clock in the morning, Cantillon called on the telephone and Kiefaber spoke to him. At that time he said that Cantillon told him that his (Cantillon's) car was broken down "on 309 near Trainer's." Defendant did not tell Mrs. Anderson the purpose of the call, as Mrs. Anderson had had a quarrel with her brother, but he suggested to Mrs. Anderson that they go for a ride to see Christmas lights. On the way to the scene he advised her what he says is the truth, that is to say, that her brother had called and they were going to pick him up, his car having broken down. He said that they looked for the vehicle but did not see it; that they turned off Route 309 onto the Old Bethlehem Pike, because he wanted to "go to the bathroom and talk to Mrs. Anderson." They then left this scene and went to Trainer's parking lot to see whether Cantillon's disabled car might be at that place. He agreed that he lied to the officer as to the purpose of his being in the vicinity, because he suspected that Cantillon might be in trouble from something he alleged the officer said. Defendant denied that Cantillon's statement was

read to him at any time. He further denied that he had at any time been in the bowling alley. He admitted part of the language attributed to him while he was in the cell, but denied other parts.

Cantillon, Martella and Mrs. Anderson all testified for defendant, and, in general, may be said to have supported his testimony. Cantillon denied that he was present when the statement was read to Kiefaber. He said, however, that he did not have a motor vehicle with him in the vicinity of Trainer's, his car having broken down in Philadelphia. His explanation regarding his call to Kiefaber was, in effect, that it was done to ask his sister to come and get him, in contemplation of the necessity for conveyance after the crime was completed, although he did not advise either his sister or Kiefaber that such a crime was in contemplation. Both he and Martella presented a rather absurd story as to their trip to the scene of the crime and of their plans regarding getting back to Philadelphia after the crime. They told of going in a public conveyance to the vicinity of Willow Grove and then, unknown to the driver, hitch-hiking on a truck on Route 611. The truck, by the greatest of good forune, took them to the scene of the crime for, although they were completely unfamiliar with the routes involved, it was essential that the truck leave Route 611 at some point and turn onto a highway connecting Routes 611 and 309. We take judicial notice of the fact that the two highways, 611 and 309, are approximately 10 miles apart at or near Doylestown through which the witnesses state their course took them. See Schmidt v. Allegheny County, 303 Pa. 560, 566. They also stated it was their purpose to hitch-hike back to Philadelphia, presumably with the loot and possibly with the burglary tools.

Defendant has assigned error in the trial in that (1) the verdict was contrary to the evidence; (2) the verdict was contrary to the weight of the evidence;

(3) the court erred in permitting the introduction of the reading of the confession; (4) the court erred in admitting evidence of the statements heard by means of the hidden microphone.

The first and second reasons may be jointly considered. Defendant argued, in effect, that the evidence being circumstantial was of insufficient quality and quantity to support a conviction. As we said in our charge, the circumstances proved must be of such as reasonably and naturally justify an inference of the guilt of the accused, and should be of such volume of quality and quantity as to overcome the presumption of innocence and satisfy the jury of the accused's guilt beyond a reasonable doubt.

We have heretofore related in some detail the evidence adduced, from which the jury could conclude that defendant was guilty of the offense beyond a reasonable doubt. There is first the fact that Kiefaber knew both Cantillon and Martella. When we couple this with the fact that Kiefaber and Cantillon's sister were at, or near, the scene, without adequate explanation, at least between the hours of 4 and 5 o'clock in the morning, we find a set of extremely suspicious circumstances indeed. Then, too, when first questioned by the police, defendant misrepresented his purpose and reason for being in the neighborhood. The making of such false and contradictory statements by the accused with intent to divert suspicion, or mislead the police, is itself evidence of guilt: Commonwealth v. Lowry, 374 Pa. 594, 601; Commonwealth v. Homeyer, 373 Pa. 150, 158-59; Commonwealth v. Jones, 341 Pa. 541, 549. In point of fact, defendant agrees that he was attempting to divert suspicion from himself, for he stated that the reason for the dissembling was the fact that he believed that Cantillon might be in trouble, and he hesitated to tell the truth for this reason. A

more believable explanation is that he knew why Cantillon and Martella were in the neighborhood, and he was attempting to discover where the plans had gone wrong, and was patrolling the neighborhood to await the agreed signal. It must be borne in mind that he and his witnesses stated that the telephone call, asking him to come to Quakertown, was received at approximately 1:30 or 2 o'clock in the morning, and that he and Mrs. Anderson left Philadelphia for the purpose of picking up Cantillon at about 2 or 2:30. Because of the distances involved, this would mean they might very well have been in the immediate vicinity of the crime from about 3 or 3:30 o'clock in the morning until 5 o'clock, without any logical reason, and with only the explanation they were looking for Cantillon's automobile. This, in spite of the fact that Cantillon said that he did not have his automobile with him. Defendant's explanation for being at Mrs. Anderson's home at 2 o'clock in the morning, when the phone call was received, is likewise difficult to accept. It is much more feasible to believe that he was there for the purpose of accepting the call from Cantillon.

This evidence, together with the statements made by defendant while his remarks were being monitored, coupled with his silence at the time of the reading of the Cantillon confession, appears to us to have afforded the jury a firm and substantial basis upon which to find defendant guilty of the crimes with which he is charged.

As to the reading of the confession of Cantillon in the presence of Kiefaber and Kiefaber's subsequent silence, the rule of evidence is well established that, when a statement made in the presence and hearing of a person is incriminating in character and naturally calls for a denial, but is not challenged, or contra-

dicted, by the the accused, although he has the opportunity and liberty to speak, the statement and the fact of his failure to deny it is admissible in evidence as an implied admission of the truth of the charges thus made. The justification of this rule is to be sought in the age-long experience of mankind that ordinarily an innocent person will spontaneously repel false accusations against him, and that failure to do so is therefore some indication of guilt. See Commonwealth v. Vallone, 347 Pa. 419, 421.

We said to the jury: "Of course, it is far from conclusive and will not alone support a verdict, that is to say, in order to justify a conviction, such failure in the face of an accusation must be accompanied by other persuasive evidence of guilt. Then, too, the accusatory statement is inadmissible as evidence in itself of the facts which it asserts, but merely to show what the charges were to which the defendant offered no denial. Its probative value arises not from the credibility of the accuser, that is to say, the credibility of Cantillon, but from the silence of the accused in response to it. In considering the weight you will give to such testimony, you must know all the surrounding circumstances under which the accusatory statement was made, and determine from all of the circumstances, including the nature of the accusation itself, whether the defendant would naturally respond to such an accusation with a prompt denial if the accusation was false. In order for you to consider the testimony and give it the force of an inference against the defendant, you must shall I say, believe it; that is to say, believe such statement was made and read; consider the statement to be incriminating in character, and there wouldn't appear to be much difficulty with this; believe that it naturally called for a denial; believe that defendant did not deny it; believe that the

defendant then was at liberty to speak and know he was at liberty to speak; believe that the defendant would be a person who would naturally respond to such an accusation with a prompt denial under all of the circumstances and evidence surrounding in this case."

We also affirmed the following points for charge:

"Point 3. The circumstances must give rise to the duty to answer if the accused would avoid the inference of acquiesence in the assertion made in his presence. Silence is considered an admission, only when the circumstances are such that a person ought to speak and does not."

"Point 6. The weight that you can give to the silence of William Kiefaber when Richard Cantillon's statement was allegedly read in his presence, if in fact you believe that it was read and he was silent and had no privilege to be silent is such that you must use caution. Persons do not all react the same way in identical situations; where one is emotional, impulsive and quick to assert his rights, another may be timid and easily cowed, especially in the presence of officers of the law; the test is perhaps the manner in which the average man is apt to conduct himself in such a situation."

"Point 7. While not a bar to the admissibility of the evidence, the fact that the person accused was under arrest and that the charges against him were made by or in the presence of police officials is to be taken into consideration by you jurors in determining whether his standing mute or silent should give rise to an inference of guilty."

We believe that the reception of this evidence was, under the cases, proper, and that we complied with the law in admonishing the jury in respect to the caution

and circumstances under which such evidence would be received. See Commonwealth ex rel. Stevens v. Myers, 398 Pa. 23, 25; Commonwealth v. Johnson, 365 Pa. 303, 318. Defendant also complains of the fact that the police officers, upon the completion of the reading of the statement, did not ask whether it was true or false. Such a specific inquiry of the accused upon the completion of the reading of the statement is not essential to its admissibility: Commonwealth v. Weigand, 134 Pa. Superior Ct. 603, 607.

As hereinabove referred to, the original statement was copied by the police officers, and there was testimony that these copies made from the original statement were exact duplicates thereof. It was from one of these statements that the officer read, defendant holding in his hand the original statement, according to the Commonwealth's testimony. The copies of the original statement were not available, and defendants' counsel contends that there was not sufficient preliminary testimony regarding the explanation of the failure of the Commonwealth to produce the copies, to justify the use of the original.

We agree that, at the time the testimony was offered and admitted into evidence, there may have been insufficient evidence produced by the Commonwealth of a careful and diligent search for the lost or misplaced typewritten copies. Recognizing this, we said at the time, addressing ourselves to the assistant district attorney: "I will say this on the record, Mr. Thatcher, that we will require the witness to testify tomorrow that he has made not a cursory, quick search, but an examination, a reasonable examination of the barracks to determine whether he can find this alleged paper. But it won't be enough to say 'I looked in my file and it wasn't there, but it might be in the barracks, but I haven't looked very carefully,' We want him to testify very carefully he has tried to find it." Subse-

quently, the deficiency in the lack of careful search was supplied by the required testmony on the part of two police officers who testified they made a thorough and complete search to try to locate the lost papers, but were still unsuccessful in discovering them.

Although counsel might have some argument that the testimony supporting the production of the second evidence was insufficient at the time the statement was read, that deficiency was overcome by reason of the production of the subsequent requisite testimony on the part of the police officers. The order of proof is, of course, within the discretion of the trial judge and if evidence, though incompetent when received, later becomes competent its previous admission is not error: Commonwealth v. Joyce, 159 Pa. Superior Ct. 45, 50; Commonwealth v. George, 178 Pa. Superior Ct. 261; Commonwealth v. Friedman, 193 Pa. Superior Ct. 640, 648; Commonwealth v. Lehman, 309 Pa. 486, 497; Commonwealth v. Mariano, 3 D. & C. 2d 277, 279.

Defendant is also critical of our admission of statements made by defendant while he was in the cell, which statements were monitored by policemen and written notations thereof made. Defendant contends that such testimony should not have been admitted, first, because it was not established that the officers were familiar with the voice of Kiefaber and, secondly, that not everything that was said in the cell was noted by the police officers. Both of the police officers said that they were familiar with the voice of Kiefaber, although, we must agree that one of them heard him speak but a few words before the monitoring. However, it was testified that the cell in which Kiefaber was kept was the one in which the microphone was placed and that his voice came in clearer than the others. The statements made by Kiefaber while in the cell were in the nature of admissions, that is to say, statements made by him pertinent to the issues

tending, in connection with other proof, to establish his guilt. See Commonwealth v. Elliott, 292 Pa. 16; Commonwealth v. Evans, 190 Pa. Superior Ct. 179, 245, affirmed 399 Pa. 387. Such admissions are not rendered inadmissible because the witness cannot give the whole of the conversation, if the statements which he did make are complete in themselves: Commonwealth v. Taylor, 129 Pa. 534. Apparently defendant here relies upon certain testimony of the officers that they might have missed some of the monitored conversation. Whatever merit there may be in this criticism of the admission of such testimony, and we believe there is little, nowhere did counsel for defendant object to its admission nor move to strike it out. Counsel may not permit the admission of incompetent testimony, without objection, and if the case should be decided adversely, then to secure a new trial upon the ground of fundamental error: Commonwealth v. Truitt, 369 Pa. 72, 80; Commonwealth v. Markwich, 178 Pa. Superior Ct. 169, 172; Commonwealth v. Tonty, 178 Pa. Superior Ct. 447, 451.

Counsel is also critical of our failure to admonish the jury in respect to these conversations by suggesting the limited opportunity that the police officers had to become familiar with the voices of the persons involved. Immediately before the conclusion of our charge, we asked counsel: "Are there any other matters to which you would have me refer, other than the points for charge?" Counsel for defendant replied, "No, sir." After disposing of the points for charge of which 12 were submitted and seven affirmed, one refused as having been covered in the general charge, and four others refused and not read, either because they had no application to the present case or were erroneous statements, we then asked counsel again "Are there any other matters to which you would have me specifically refer, gentlemen?" To which counsel

for defendant again replied in the negative. In addition, no exception was taken to the charge. As was said in Commonwealth v. Parente, 184 Pa. Superior Ct. 125, 126: "It is the duty of counsel to call attention to matters which have not been properly covered in the charge; counsel may not remain silent and take his chance of the verdict, and then, if it is adverse, complain of matters which could have been immediately rectified. Commonwealth v. Walker, 178 Pa. Superior Ct. 522, 116 A. 2d 230 (1955); Commonwealth v. Napoli, 180 Pa. Superior Ct. 266, 269, 119 A. 2d 845 (1956)."

Although counsel did not except to our refusal of several of his points for charge, we enumerate those refused. No. 2 is as follows: "Your jurors must consider not only the evidence of the Commonwealth, but also the testimony given by the defendant, William Kiefaber, as to Kiefaber's conduct at the time Richard Cantillon's statement was allegedly read to Kiefaber, and only if you accept the testimony of the Commonwealth's witness that Kiefaber stood mute could his silence be deemed an admission of guilt. If instead, you believe that Kiefaber explained in understandable language that he did not have to answer questions as a person accused of a crime his silence is not an admission of guilt."

We affirmed the point to this extent:

"Mr. Kiefaber, as you recall, said that this statement was not read at all to him and, of course, if that occurred, then the statement has no place in this case whatsoever."

Since there was no evidence whatever on behalf of either the Commonwealth or defendant that Kiefaber explained "that he did not have to answer questions as a person accused of a crime," the last sentence of the point becomes meaningless.

The fourth and fifth points for charge were as follows:

"No. 4. A defendant's claim of the privilege to decline to furnish evidence against himself cannot be construed as an admission of guilt, nor even as a presumption against him, no matter what his motive in claiming the privilege. No. 5. The language of the defendant's claim to the privilege to decline to furnish evidence against himself is not important; no specific term or expression is required in order to enable him to assert the privilege so long as it is so understood."

We did not then, nor do we now, understand the application of these principles of law to the case before us and, therefore, refused to affirm these two points.

The ninth point was as follows:

"When a crime is sought to be sustained by circumstantial evidence, the hypothesis of guilt should flow from the facts and circumstances proved and be consistent with them all and the facts and circumstances must not only be consistent with and point to the guilt of the accused but must be inconsistent with his innocence."

Recognizing the rule spelled out in Commonwealth v. Marino, 142 Pa. Superior Ct. 327, 333-34, we had charged the jury that: "The circumstances proved should be such as reasonably and naturally justify an inference of the guilt of the accused, and should be of such volume and quantity and quality as to overcome the presumption of innocence and satisfy the jury of the accused's guilt beyond a reasonable doubt," and refused the point. See also Commonwealth v. Carey, 368 Pa. 157, 163.

The tenth and eleventh points have to do with reasonable doubt. We refused them as we had properly covered this instruction in our general charge.

*Order*

And now, July 28, 1961, the motion for a new trial in the foregoing case is overruled, denied and refused. Defendant, William Kiefaber, is directed to appear before this court on Friday, September 1, 1961, in order that sentence may be imposed.